RECEIVED
AUG 0 1 2025
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bishop Wayne R. Felton, individually, and The Holy Christian Church International,

    Plaintiffs,

v.

De'Mario Jives, individually, and DeMajio Media LLC,

    Defendants.

Court File No. 23-cv-467 (DTS)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT, ENTER EMERGENCY JUDGMENT, AND FOR CONTEMPT SANCTIONS**

## INTRODUCTION

This Motion seeks enforcement of a court-supervised Settlement Agreement that Defendants have willfully and repeatedly violated, warranting the issuance of an Order to Show Cause for Civil Contempt. Plaintiffs respectfully submit this Memorandum in support of their Motion to Enforce the Settlement Agreement and the Sanctions Orders previously entered by this Court.

Defendants De'Mario Jives and DeMajio Media LLC have knowingly and willfully breached the terms of a binding Settlement Agreement adopted by this Court, resulting in forty-one (41) documented infractions. The record reflects ongoing, deliberate noncompliance with the Court-approved Agreement. Each infraction constitutes a clear violation of the express terms negotiated and agreed upon by the parties, as demonstrated by the Court's prior enforcement actions (see Dkt. 88 and Dkt. 93) and the Agreement itself.

SCANNED
AUG 0 1 2025
U.S. DISTRICT COURT MPLS

1

Accordingly, Plaintiffs seek enforcement of the $100,000 per-violation confession of judgment clause, totaling $2,100,000, in addition to the $50,000 sanction (Dkt. 88) and $27,845 attorney's fee award (Dkt. 93), for a total judgment of $2,177,845.

<u>FEDERAL COURT JURISDICTION TO ENFORCE THE SETTLEMENT AGREEMENT</u>

In *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994), the United States Supreme Court held that a federal district court does not automatically retain jurisdiction to enforce a settlement agreement following dismissal of an action, unless:

1. the court's dismissal order expressly retains jurisdiction, or
2. the settlement agreement is incorporated into the court's dismissal order.

Although this Court's dismissal order may not have contained explicit retention language, the Court has clearly exercised post-dismissal enforcement authority through multiple orders, including:

- A $50,000 sanctions order (Dkt. 88);
- A $27,845 attorney's fees award (Dkt. 93);
- Judicial interpretation and application of the Settlement Agreement's injunctive terms.

Such post-dismissal activity demonstrates the Court's ongoing jurisdiction to enforce the Settlement Agreement, consistent with *Kokkonen*. Numerous courts have affirmed that this kind of judicial conduct satisfies the requirement for retained jurisdiction. See *Brass Smith, LLC v. RPI Indus., Inc.*, 827 F. Supp. 2d 377, 384 (D.N.J. 2011) (finding

jurisdiction where the court entered post-dismissal enforcement orders); see also 13D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3523.2 (noting the availability of ancillary jurisdiction for enforcement of settlements).

Having established that this Court retains jurisdiction to enforce the Settlement Agreement, Plaintiffs now turn to the specific basis for seeking civil contempt.

COURT'S AUTHORITY TO ENFORCE SETTLEMENT VIA CONTEMPT POWERS

Federal courts have long held that when a settlement agreement is incorporated into a consent decree—or functions as one through continued judicial enforcement—its terms are enforceable under the court's inherent contempt powers. This principle is both doctrinally sound and practically essential when a party refuses to comply with binding judicial orders.

In *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 518 (1986), the Supreme Court stated unequivocally:

"Noncompliance with a consent decree is enforceable by citation for contempt of court." The Court explained that a consent decree is:

"An agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Id.* at 519.

This enforcement principle traces back to *United States v. City of Miami*, 664 F.2d 435, 440 & n.8 (5th Cir. 1981), where the court held that consent decrees are not merely private contracts but carry the binding authority of a judicial command.

3

The Supreme Court reaffirmed this in *United States v. Armour & Co.*, 402 U.S. 673, 676–77 (1971), holding that once a settlement agreement is embodied in a court order, its terms are no longer simply contractual—they become enforceable through federal judicial power. As the Court noted:

"Consent decrees have attributes both of contracts and of judicial decrees… [They] have the force of res judicata." *Id.*

Although the dismissal in this case may not have labeled the Settlement Agreement a "consent decree" in form, it has clearly functioned as one in substance. The Court has exercised ongoing enforcement authority (see Dkt. 88 and Dkt. 93), issued sanctions, awarded attorneys' fees, and interpreted the scope of the injunctive terms. This post-dismissal activity places the agreement squarely within the framework of continuing federal jurisdiction under *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), and supports enforcement through contempt under the logic of *Firefighters* and *Armour*.

Thus, when a litigant—here, the Defendants—repeatedly defies such an agreement despite clear judicial warnings and orders, the Court may rightfully invoke its authority not merely as an enforcer of private contract rights, but as the guardian of its own decrees.

Accordingly, Plaintiffs respectfully request that this Court issue an Order to Show Cause for Civil Contempt, directing Defendant Jives to appear and explain why he should not be held in contempt for willfully violating the Settlement Agreement and prior court orders (Dkt. 88, Dkt. 93). Because the Court has already retained and exercised jurisdiction over this matter, the request is procedurally proper under *Kokkonen*, and

consistent with the Court's well-established authority to enforce consent decrees—or their functional equivalents—through contempt. See also *Firefighters*, 478 U.S. 501; *Armour*, 402 U.S. 673.

ENFORCING LIQUIDATED DAMAGES CLAUSES UNDER FEDERAL LAW

Federal courts—including the Eighth Circuit and this District—have consistently upheld liquidated damages clauses when the following three conditions are satisfied:

1. The harm resulting from breach is difficult to quantify at the time of contract formation;
2. The liquidated amount is a reasonable forecast of anticipated damages; **and**
3. The clause was freely negotiated by parties represented by counsel.

In *Godes v. Skipperliner Indus., Inc.*, No. 10-cv-92, 2010 WL 3862817, at *3 (D. Minn. Sept. 10, 2010), the court noted that "[l]iquidated damages clauses are generally enforceable under Minnesota law unless they are so unreasonable as to constitute a penalty." The court upheld the clause at issue because the reputational and business harm involved was not readily measurable. It recognized that, in such cases, a liquidated sum functions to deter breach and provide certainty of remedy, especially when damages are intangible or speculative.

Likewise, in *United States v. Sentry Ins.*, 201 F.3d 1092, 1094 (9th Cir. 2000), the Ninth Circuit affirmed a liquidated damages provision in a federal contract, holding that "[l]iquidated damages provisions are particularly appropriate when it is difficult to calculate the amount of actual damages incurred due to a breach." The court emphasized

that when such provisions are not grossly disproportionate to the probable loss, they are presumed valid and reflect the parties' deliberate judgment.

Here, each of the three enforceability elements is clearly satisfied:

1. **Difficult to Quantify Harm**: The reputational, ecclesiastical, and communal harm caused by Defendants' statements targeting a bishop and a religious denomination is inherently difficult to reduce to a fixed sum. Public trust, ministry credibility, and ecclesial authority are not easily tabulated. Even if damages could be litigated individually, doing so would unduly burden both the Court and the injured party.

2. **Reasonable Estimate**: The $100,000 per-violation figure is neither excessive nor arbitrary. It reasonably reflects the harm associated with each public-facing video, post, or comment—many of which have received thousands of views, incited harassment, and caused confusion within the religious community. Given the viral nature and permanence of online content, each instance imposes enduring injury. This figure was not improvised; it was negotiated, agreed upon, and adopted as a meaningful deterrent and compensatory mechanism.

3. **Freely Negotiated Clause**: The Settlement Agreement was executed by both parties, each represented by licensed attorneys. There is no allegation—or evidence—of duress, fraud, or unequal bargaining power. Indeed, the agreement was submitted to this Court and later referenced in its enforcement orders (Dkt. 88 and Dkt. 93), confirming its fairness and judicial oversight.

Accordingly, the liquidated damages provision functions exactly as intended under federal law: as a predictable, enforceable, and equitable remedy where actual damages

6

are otherwise uncertain or ongoing. It is not a penalty, but a contractually valid instrument of justice.

Therefore, this Court should fully enforce the $100,000 per-violation provision in the Settlement Agreement, consistent with the persuasive authority of *Godes*, *Sentry Ins.*, and other analogous federal decisions. Doing so honors binding precedent, safeguards the integrity of this Court's prior enforcement orders, and reinforces the sanctity of judicially supervised settlements.

## DEFENDANTS' CONTINUED NONCOMPLIANCE

This Court's October 2024 Order (Dkt. 88) explicitly noted that Defendant Jives:

- Set content to "private" rather than permanently removing it;
- Misled the Court regarding his compliance;
- Continued producing innuendo-laced and explicit content about Plaintiffs.

Despite prior judicial admonition, Defendant Jives has failed to remove content he expressly agreed to delete and has instead published new videos—each time-stamped and cataloged—which directly violate the Settlement Agreement. These publicly accessible and monetized broadcasts target Bishop Felton, his family, and the Church, causing ongoing reputational harm and disrupting Plaintiffs' peace.

On May 1, 2025, Defendants aired a broadcast titled "GOOD MORNING: I EXPOSED 3 Pastors in 24 Hours (and They Called Me!)", during which Jives openly violated the Settlement Agreement by stating:

"I promise you I still have the videos. I still have the text messages. I still have the letters."

7

This statement clearly referenced the litigation involving Bishop Felton, as Jives continued:

"All of this evidence holds up in court and y'all can spin this however y'all choose to do it. I don't care if I was talking about Lamar Whitehead. I don't care if I was talking about Raheem Warren. I don't care who the [expletive] I was talking about. All this evidence holds up in court 'cause it's not me saying it, it's the victim saying it…"

Approximately sixteen minutes earlier in the same video, Jives directly referenced Bishop Felton and falsely accused him of participating in a conspiracy with other bloggers regarding the court proceedings. Jives stated:

"…People sit out here and they talked about my whole court case, right? Isn't it funny that that same person's on their platform now? Okay, so I don't know who I'm talking about."

The reference was to Bishop Felton's appearance on a video blogger's broadcast, where he answered questions exclusively about God, Scripture, and theology. In full compliance with the Settlement Agreement, Bishop Felton has not publicly discussed the Defendants or the case.

Furthermore, during that same broadcast, Defendants permitted a panel guest to disparage Bishop Felton—calling him "evil"—without correction or objection, thereby tacitly endorsing the defamatory statement.

Another incident occurred on May 27, 2025, during an episode of the St. James Show, which has received 9,766 views as of August 1, 2025. In this episode, Defendants again referenced the case and disparaged Bishop Felton. Rather than avoid the subject—

as required by the Settlement Agreement—Jives voluntarily introduced it while criticizing blogger Christopher St. James' coverage. Notably, the St. James Show has discussed this case eleven times, with an estimated 44,000 cumulative views. During the broadcast, Jives falsely accused Bishop Felton of sabotage, saying he was "trying to get me slipped up."

This statement is a direct violation of:

- Section 1(b) of the Settlement Agreement: "...not to make any further posts, statements, or other content concerning or related to Bishop Felton, his family, or the Church"; and

- Section 2(a): "...shall [not] disparage the other, including their families and the Church."

These actions constitute a clear and material breach of the Settlement Agreement. They have caused further reputational damage to Bishop Felton, with offending broadcasts viewed by thousands. In fact, Bishop Felton, his family, and members of The Holy Christian Church International were contacted by individuals who had viewed the content to alert them to the ongoing violations.

### III. REQUEST FOR JUDICIAL RELIEF

WHEREFORE, in light of Defendants' forty-one (41) separate breaches of the Settlement Agreement which constitute the number of links which display Bishop Felton's image, defame his name, and speak disparagingly of The Holy Christian Church International and his family—each constituting an independent triggering event under the

9

confession of judgment provision—and their ongoing direct and indirect references to Bishop Felton and this case, Plaintiffs respectfully request that this Court:

1. Enter judgment in the amount of $2,100,000 (representing 41 violations × $50,000, consistent with the previously imposed sanction, at minimum);
2. Add the previously ordered sanctions and attorneys' fees totaling $77,845;
3. Affirm this Court's continuing jurisdiction under its ancillary enforcement authority or, in the alternative, reassert jurisdiction pursuant to Federal Rule of Civil Procedure 60(b);
4. Authorize post-judgment remedies, including but not limited to garnishment and writs of execution.

These infractions—marked by defamatory content and persistent noncompliance—will likely continue absent this Court's decisive enforcement. A clear judicial response is necessary to uphold the authority of the Settlement Agreement and this Court. Despite ample admonitions and formal warnings issued since the Settlement Agreement's entry in September 2024, Defendants have demonstrated a consistent pattern of disregard for the Court's orders and a willful failure to comply with the agreed-upon terms.

## IV. CONCLUSION

The enforceability of judicially supervised settlements depends on the Court's authority and willingness to uphold them. The record is unequivocal: Defendants knowingly agreed to specific injunctive and monetary provisions, have repeatedly violated those terms, and continue to flout their legal obligations. Accordingly, Plaintiffs respectfully request that

this Court enter judgment in the total amount of $2,177,845 and grant all further relief deemed just and necessary to compel compliance and effectuate restitution.

Dated: August 1, 2025                    Respectfully Submitted,

Bishop Wayne R Felton
125 Stevens Street West
St. Paul, MN 55107
P: (651) 382-6394
bishop@thcci.org

***Pro Se Plaintiff***